**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CHARLES W. S.[1],**

        **Plaintiff,**

                                  **Civil Action 2:21-cv-349**

    **v.**                          **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

**OPINION AND ORDER**

Plaintiff, Charles W. S., brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for social security disability insurance benefits. This matter is before the Court for disposition based upon the parties' full consent (ECF Nos. 6, 7), and on Plaintiff's Statement of Errors (ECF No. 18), the Commissioner's Memorandum in Opposition (ECF No. 23), Plaintiff's Reply (ECF No. 24), and the administrative record (ECF No. 12). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

**I.    BACKGROUND**

Plaintiff protectively filed his application for benefits on June 28, 2018, alleging that he has been disabled since June 1, 2016, due to: arthritis and disc degeneration down his entire spine; a heart condition stemming from a 2002 double bypass surgery; depression; headaches; numbness in his hands and fingers from nerve pinching; IBS; acquired under active thyroid,

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

sleep apnea; and calcification of the abdominal aorta. (R. at 234-240, 275.) Plaintiff's application was denied initially in April 2019 and upon reconsideration in August 2019. (R. at 125-163, 166-173.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 174-175.) Administrative law judge Gregory Smith (the "ALJ") held a telephone hearing on July 13, 2020, at which Plaintiff, who was represented by counsel, appeared and testified. (R. at 51-87.) A vocational expert ("VE") also appeared and testified. (*Id.*) On July 31, 2020, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 29-50.) The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-7.)

## II. RELEVANT RECORD EVIDENCE

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's relevant hearing testimony as follows:

At the hearing, [Plaintiff] testified to a history of multiple impairments that have progressed throughout the years. He testified his hands are his biggest issue that prevents him from working. He complained of ongoing, intense, bilateral hand pain so significant that he is unable to use a keyboard. He said he believes his left hand is worse than the right. He is right hand dominant. [Plaintiff] further testified he has to sit in a recliner and lay back, secondary to lumbar discomfort; has pain so extensive that it keeps him up all night; has neck discomfort with inability to raise his arms "above 4 o'clock" without pain; and has difficulty associated with sleep apnea. [Plaintiff] described a pain intensity level ranging between 4 and 5 most days. He testified to taking over-the-counter medication along with tramadol approximately 4 times per day. He complained he has trouble getting neck surgery scheduled due to the COVID-19 pandemic. Specifically related to his neck, he testified to difficulty raising his arms. As to the lower back, [Plaintiff] testified that since prior lumbar surgery with placement of 6 rods and 8 screws, his back seems better. He testified he sometimes has difficulty picking up items from the floor and requires assistance. However, he acknowledged that he can walk a mile, testifying he walks 2 times per week. [Plaintiff] testified to a maximum lifting/carrying capacity of 10 to 15 pounds "maybe," but said he might drop the item. Per his hearing testimony, he has a walker "if he needs it." Accompanying his musculoskeletal complaints, [Plaintiff] testified to a history of coronary issues,

specifically testifying to a history of shortness of breath and heart attack with prior heart/bypass surgery.

***

He confirmed at the hearing that he does not see a counselor or therapist and has never seen one. He testified that his depression is better with medication.

***

At the hearing, he testified he walks two times per week and walks about a mile each time; he watches television, listens to music and talks with his wife; he drinks socially; he can groom himself independently; he likes to cook "but it's simple meals, nothing extravagant"; he tries to take out the trash; he grocery shops alone; and goes out socially with his children.

(R. at 39, 43.)

## B.  Relevant Medical Records

The ALJ summarized the relevant medical record evidence as follows:

Early radiology includes a March 21, 2016 lumbar x-ray confirming multilevel, severe degenerative changes, absent any acute compression deformity, and cervical CT conducted on the same day revealing multilevel advanced degenerative changes, moderate to severe, most pronounced at the C4-7 levels (following a motor vehicle accident). Repeat cervical MRI of May 28, 2016 showed moderate to severe cord compression and canal stenosis at C6-7. Additionally, EMG results reviewed on September 1, 2016 confirmed bilateral carpal tunnel syndrome.

With regard to treatment, interim records show [Plaintiff] established care with Dr. Paul Harris, III, DO on July 1, 2016, reporting chronic neck and back pain, and numbness and tingling in both arms and legs, arising from a motor vehicle accident of March 21, 2016. He also reported headaches once a week secondary to cervical issues. It was not until over a year later that [Plaintiff] established care with pain management physician, Shruti Kapoor, MD., on June 12, 2017, with treatment with Dr. Kapoor consisting of a series of both cervical and lumbar epidural steroid injections, SI joint injection, lumbar medial branch blocks, and lumbar radiofrequency ablations. [Plaintiff] was also prescribed pain medications, including Norco and Tramadol, and he attended physical therapy. According to related reports, [Plaintiff] referenced neck pain for years that was exacerbated by the motor vehicle accident; he acknowledged prior steroid and other joint injections that had previously been helpful to him. There was some limitation in cervical and lumbar range of motion and extension on exam, but with negative straight leg raising and intact neurological exam. There was no sensory deficit; [Plaintiff] had normal strength and reflexes; he displayed no atrophy; and Romberg sign was

3

negative. Accompanying mini psychiatric exam was negative as well, with [Plaintiff] displaying normal mood, affect, behavior, and thought content. As to axial neck pain along with bilateral arm pain and radiculopathy, Dr. Kapoor was pleased [Plaintiff] was denying any saddle anesthesia, that he did not have any upper motor neuron sigs, and that his reflexes appeared mostly intact. Physical exam findings on follow-up of August 14, 2017 were essentially unchanged, with Dr. Kapoor confirming she did not clearly see any cord compromise on the cervical MRI of July 31, 2017. She noted [Plaintiff's] evaluation with Dr. Raymond, following which cervical epidural steroid injection was recommended, and that she agreed with the recommendation.

As of September 25, 2017, [Plaintiff] had undergone epidural steroid injection at the cervical level and reported good efficacy, with almost 95 percent pain relief in the left arm; he also said he no longer had any numbness or tingling on the left. There were some continuing, right-sided symptoms that were somewhat improved. [Plaintiff] did describe continued lower back discomfort with prolonged sitting, standing, and walking difficult for him. He denied any intermittent numbness. He was scheduled for lumbar epidural steroid injections, along with repeat cervical steroid injection. These procedures were conducted the following day and [Plaintiff] tolerate them well.

He continued to undergo related injections throughout mid-2018, ultimately undergoing surgical intervention on October 15, 2018, with Dr. Francis Paul Degenova, DO, performing transforaminal lumbar interbody fusion L4-5 and L5-S1/ decompressive bilateral laminectomy, bilateral facetectomy, and neural foraminotomy at L3-4, L4-5, and L5-S1. According to reports, following the lumbar surgery, [Plaintiff] was to undergo surgery with Dr. Degenova to address the cervical spine. However, that procedure was postponed for various reasons since the beginning of 2019.

On March 5, 2019, Dr. Degenova office visit notes indicate that cervical surgery was postponed due to [Plaintiff's] reports that he was having problems with his mother-in-law's health. [Plaintiff] had finished physical therapy and note some improvement with traction. At this time, he was scheduled to undergo anterior cervical discectomy and fusion (ACDF) of C3-7 with instrumentation and bone graft. Subsequent cervical MRI of April 27, 2019 showed severe multilevel discogenic disease and severe facet joint arthropathy of the cervical spine. Cervical CT just two months earlier revealed mild reversal of the cervical spine curvature which was stable, along with intact facet joints; stable C4-5 severe degenerative disc disease with stable mild spinal stenosis; stable severe degenerative disc disease at C5-6; and stable severe degenerative disc disease at C6-7, with moderate spinal stenosis which was also stable.

According to [Plaintiff], cervical surgery was subsequently postponed in order to address findings of a soft tissue mass on a May 16, 2019 brain MRI. In view of the related imaging report, there was no evidence of hydrocephalus and no acute

4

intracranial abnormality shown. Surgery was then said to be scheduled for November 20, 2019, but was, again, postponed because [Plaintiff] reports he was unable to get an updated MRI and/or finish a required class by the surgery date. Since that time, the COVID-19 pandemic has delayed surgery. Noteworthy, during the cardiac clearance exam of October 28, 2019, just prior to the postponement of the November 2019 cervical surgery, musculoskeletal exam revealed normal range of motion, absent any tenderness or edema. [Plaintiff] had no cervical adenopathy and he was also neurologically intact, exhibiting normal muscle tone and coordination. Mini psychiatric exam continued to show normal mood, affect, and behavior.

Musculoskeletal exam as of March 10, 2020 was negative for any edema and [Plaintiff] acknowledged he was continuing to take Tramadol with benefit. [Plaintiff] has continued in follow-up, engaging in telephone clinic visits since that time due to the COVID-19 pandemic. An April 14, 2020 telephone visit report references complaints of constant neck discomfort with difficulty lifting the arms above the head as well as with carrying even small items, including a cup of coffee, that results in arm heaviness. During this same visit, [Plaintiff] described declining balance, with indications that he has fallen a few times. He denied any recent physical therapy on his neck and said he was taking tramadol, Tylenol and Ibuprofen. Dr. Degenova assessed cervical stenosis of the spine and recommended [Plaintiff] undergo additional physical therapy. [Plaintiff] declined the need for additional pain medication. The next month, on telephone follow-up with primary care physician, Dr. Harris, [Plaintiff] reported he was continuing to take tramadol with benefit. Musculoskeletal review of systems was positive for some arthralgias and back pain, but there were no indications for any gait abnormalities or decreased motor function.

Accompanying his musculoskeletal complaints, the undersigned notes [Plaintiff's] additional reports of coronary artery disease, hypertension and hyperlipidemia with a history of coronary artery double bypass surgery in 2002. Well prior to the alleged onset date of disability and during a period of continuing work activity, a left heart catheterization in 2004 showed non-obstructive coronary artery disease. Subsequent stress test in 2015 was negative for ischemia. Also noted, as of October 28, 2019, hypertension was deemed "well-controlled" with the examiner at that time finding "no contra indication for needed surgery from cardiac stand point". In fact, the report was that [Plaintiff] had been doing well with no chest pain or shortness of breath. There is no evidence of any ongoing difficulties related to [Plaintiff's] cardiovascular health, requiring any extensive follow-up, frequent emergency medical attention or surgical intervention during the period at issue.

***

The balance of physical exams throughout the relevant period are within normal limits. Exams have reflected some lumbar and cervical tenderness with indications for restricted range of motion and extension at times. However, there are no

indications for any significant gait abnormalities, joint dysfunction/joint instability, or extensive sensory or motor deficits. Despite [Plaintiff's] testimony at the hearing that he has a walker if needed, there are no reports of the need or prescription for any assistive device in the file. [Plaintiff] has generally ambulated unassisted during the entire period in question. In fact, at the June 2019 consultative psychological evaluation, gait was unremarkable, as was motor activity. At the hearing, [Plaintiff] testified that his hands is his biggest issue. The bulk of the evidence addresses complaints related to the neck and back, with no report of any significant difficulties in the hands. [Plaintiff] has reported discomfort with overhead reaching/raising his arms overhead secondary to cervical spine issues, but no other complaints of manipulative limitation or other restrictions specifically related to the hands/fingers. EMG testing in early 2016 confirmed bilateral carpal tunnel syndrome, with [Plaintiff] reporting worsening numbness and tingling at the time. However, following that visit, there is no indication of any ongoing symptomatology specifically related to the hands requiring specific treatment. In fact, there is little to no mention of the hands as cause for significant functional limitation or need for more aggressive examination in subsequent clinic notes.

(R. at 39-42 (internal citations omitted, emphasis in original)[2].)

C. **Relevant Medical Opinions**

The ALJ summarized the relevant medical opinion evidence throughout the record as

follows:

The undersigned has considered the April and August 2019 opinions of the State Agency medical consultants, at Exhibits 1A and 3A. These examiners also found [Plaintiff] does not have a severe mental impairment, with indications for no more than "mild" limitations related to the "B" criteria of the mental health impairments. They also found [Plaintiff] limited to less than the full range of light exertion. The undersigned finds their opinions finding the record fails to reflect the presence of a severe mental impairment persuasive. [Plaintiff] has acknowledged depression is generally well controlled with medication prescribed by his primary care provider. He has not seen any mental health specialist for counseling or psychotherapy, and he has not had or required any emergency medical attention or inpatient hospitalization due to chronic mental instability. The State Agency opinions finding [Plaintiff] limited to light exertion are less persuasive. Documented medical evidence in the file, including radiographic imaging confirming cervical and lumbar moderate to severe degenerative disc disease and facet arthropathy; October 15, 2018 transforaminal lumbar interbody fusion L4-5 and L5-S1/ decompressive bilateral laminectomy, bilateral facetectomy, and neural foraminotomy at L3-4, L4-

---

[2] Although the Court suspects the emphasis was not intended and is merely a transcript error, it nevertheless has not removed it for purposes of ensuring the record is complete.

6

5, and L5-S1; and reports of additional scheduling of cervical surgery supports the restriction to sedentary exertion with the additional postural, manipulative, and environmental restrictions outlined. The above residual functional capacity provides an accurate representation of [Plaintiff's] impairments and their impact on his remaining functional abilities.  The undersigned finds the State Agency's opinion that [Plaintiff] can perform his past relevant work persuasive. Even though the undersigned finds [Plaintiff] more limited exertionally than that found by the State Agency medical consultants, the indicated residual functional capacity for sedentary exertion with the additional manipulative, postural and environmental restrictions indicated does not preclude the performance of [Plaintiff's] past relevant work as a computer programmer as generally performed. ***

The undersigned finds the November 2018 opinion of the consultative psychological examiner concerning [Plaintiff's] alleged mental impairment and remaining functional abilities is persuasive to the extent consistent with the indicated residual functional capacity. This examiner identified depression as a current deficit in dealing with workplace stress and pressure, but found [Plaintiff's] "mental illness symptoms have had a mild effect on his work history and behavior in the area of stress tolerance." The undersigned finds the degree of limitation associated with depression unpersuasive, as the evidence, in totality, fails to substantiate this as a severe impairment, as defined in the regulations. However, the additional finding that [Plaintiff's] mental illness symptoms essentially have a mild effect on his ability to perform basic work tasks is persuasive, as it is consistent with a finding of a non-severe mental impairment in this case. The undersigned finds the overall opinions following the subsequent consultative psychological evaluation of June 2019 persuasive for similar reasons. The consultative examiner found no significant restrictions with respect to [Plaintiff's] capacity for understanding, remembering and carrying out instructions; maintaining attention and concentration to perform simple and multi-step tasks; responding appropriately to supervision and coworkers in a work setting; and responding to work pressures in a work setting. [Plaintiff's] overall intellectual functioning was estimated to be in the average range; his job history includes no problems with performance; daily functioning includes having the ability to manage finances; maintain a schedule, shop drive, and perform activities of daily living; there were no behavioral or attention deficits observed or alleged; and his history of interactions with co-workers, supervisors and others was reported to be good.

(R. at 44-45, internal citations omitted.)

## III.  ADMINISTRATIVE DECISION

On July 31, 2020, the ALJ issued his decision.  (R. at 29-50.)  The ALJ found that

Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2021.

(R. at 35.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff has not

engaged in substantial gainful activity since June 1, 2016, the alleged onset date. (*Id.*) The ALJ

found that Plaintiff has the following severe impairments: cervical and lumbar  degenerative disc

disease, coronary artery disease, and obesity. (*Id.*) The ALJ further found that Plaintiff does not

have an impairment or combination of impairments that meets or medically equals the severity of

one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 38.)

Before proceeding to step four, the ALJ set forth Plaintiff's residual functional capacity

("RFC") as follows:

> After careful consideration of the entire record, the [ALJ] finds that [Plaintiff] has
> the residual functional capacity to perform sedentary work as defined in 20 CFR
> 404.1567(a) except, he can lift/carry 10 pounds occasionally and less than 10
> pounds frequently; sit for 6 hours, stand for 2 hours and walk for 2 hours; push/pull
> as much as lift/carry; occasionally reach overhead to the left and to the right;
> occasionally climb ramps and stairs, as well as occasionally balance, stoop, kneel,
> crouch, and crawl; never climb ladders, ropes or scaffolds; and never work at
> unprotected heights or with moving, mechanical parts.

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or
     equal the criteria of an impairment set forth in the Commissioner's Listing of
     Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant
     perform his or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual
     functional capacity, can the claimant perform other work available in the national
     economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

(*Id.*)  At step four of the sequential process, the ALJ determined that Plaintiff is capable of

performing his past relevant work as a computer programmer.  (R. at 45.)  The ALJ therefore

concluded that Plaintiff has not been disabled since June 1, 2016.  (R. at 46.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial

evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r

of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th

Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its own

regulations and where that error prejudices the claimant on the merits or deprives the claimant of

a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.   ANALYSIS

Plaintiff puts forth one assignment of error:  that the ALJ's RFC determination is unsupported by substantial evidence as it fails to incorporate limitations stemming from Plaintiff's impairments of carpal tunnel syndrome, cervical radiculopathy, and depression.  (ECF No. 18 at PAGEID ## 1362-1370.)  Plaintiff argues that after finding that Plaintiff's carpal tunnel syndrome was a non-severe impairment, the ALJ "included no manipulative limitations in the RFC related to Plaintiff's hands," and that "[d]espite finding limitations in all four areas of mental functioning, the ALJ also failed to include[] mental limitations in the RFC determination."  (*Id.* at PAGEID # 1363.)  With regard to Plaintiff's manipulative limitations, Plaintiff argues that it was "outlandish" for the ALJ to conclude that there was no ongoing symptomology of the hands suggesting the need for ongoing treatment, and "little to no mention of the hands" as a cause of functional limitations.  (*Id.* at PAGEID # 1364.)  Regarding his mental limitations, Plaintiff also argues that "[t]here is a disconnect between the RFC determination and the ALJ's Step 2 analysis, which must be reconciled."  (*Id.* at PAGEID # 1369.)

In response, the Commissioner rejects Plaintiff's arguments, contending that "the ALJ supportably determined at step two . . . that Plaintiff's carpal tunnel syndrome and mental impairments were non-severe impairments" and that "the ALJ considered *all* of Plaintiff's impairments . . . as required."  (ECF No. 23 at PAGEID # 1383 (emphasis in original).)  Specifically, as to Plaintiff's carpal tunnel syndrome and cervical radiculopathy, the Commissioner maintains that "the ALJ supportably concluded that Plaintiff's carpal tunnel

10

syndrome was not severe at step two," and "[e]ven so, the ALJ explicitly considered Plaintiff's carpal tunnel syndrome in the RFC portion of the decision, as required." (*Id.* at PAGEID # 1384.) The Commissioner argues that the ALJ also reviewed subjective and objective evidence regarding Plaintiff's cervical radiculopathy," and that the ALJ noted that "Plaintiff admitted to wide-ranging daily activities as he went for mile-long walks, could prepare meals, groom himself independently, take out the trash, and shop for groceries alone." (*Id.* at PAGEID ## 1385-1386.) The Commissioner also highlights the ALJ's reliance on the opinions of the State agency consultants, neither of whom indicated that Plaintiff had any fingering or handling restrictions. (*Id.* at PAGEID # 1387.) The Commissioner also takes issue with Plaintiff's attempt to "bootstrap[]" his carpal tunnel complaints . . . with his neck pain complaints," arguing that "Plaintiff points to no medical evidence or physician's statement confirming that his carpal tunnel syndrome symptoms 'overlap' with his cervical radiculopathy." (*Id.* at PAGEID # 1388 n.1.) Regarding Plaintiff's mental impairments, the Commissioner argues that "the ALJ supportably concluded at step two that Plaintiff's depression was not severe," and that "the ALJ had no requirement to adopt mental restrictions in the RFC simply because he found 'mild' restriction in the domains of mental functioning at step two." (*Id.* at PAGEID ## 1390-1393.) The Commissioner also argues that Plaintiff "cites no evidence in support of his contention that he requires greater mental limitation due to his depression, despite his burden to do so, nor does he identify what mental limitations he requires." (*Id.* at PAGEID # 1393.)

In his Reply brief, Plaintiff reiterates that the ALJ's failure to find Plaintiff's radiculopathy as a medically determinable impairment, coupled with the lack of restrictions, "is harmful legal error." (ECF No. 24 at PAGEID # 1397.) Plaintiff argues that he "clearly met the standards of severity" in this case because he "underwent repeat injections, constantly reported

pain, and displayed weakness and sensation changes in his hands," and submits that the ALJ "did not explicitly consider the impact of these impairments as related to the RFC." (*Id.* at PAGEID # 1398.) Plaintiff does not, however, address any of the Commissioner's arguments regarding his mental limitations in the Reply brief. (*Id.* at PAGEID ## 1397-1398.) The matter is thus ripe for judicial review.

As the Sixth Circuit and this Court have observed several times, step two of the evaluation process is merely meant to "screen out totally groundless claims," and it is well settled that where an ALJ "considers all of a claimant's impairments in the remaining steps of the disability determination, any perceived failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Kestel v. Comm'r of Soc. Sec.*, 756 F. App'x 593, 597 (6th Cir. 2018) (citing *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (quoting *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987))); *see also Rosshirt v. Comm'r of Soc. Sec.*, No. 2:19-CV-3280, 2020 WL 4592393, at *3 (S.D. Ohio Aug. 11, 2020) ("**Even assuming that the ALJ should have discussed plaintiff's alleged [impairment] at step two, any error from this omission was harmless**. Step two is the means by which the Commissioner screens out totally groundless claims, and is a '*de minimis* hurdle[.]'") (emphasis added; internal quotations and citations omitted).

Against that backdrop, Plaintiff's arguments are not well taken. First, the Court finds that Plaintiff mischaracterizes the ALJ's decision by proclaiming that "[t]he ALJ did not consider Plaintiff's non-severe impairments of carpal tunnel syndrome or depression during the following steps of his determination." (ECF No. 18 at PAGEID # 1363.) First, for example, the ALJ expressly discussed Plaintiff's carpal tunnel during the RFC analysis as follows:

EMG testing in early 2016 confirmed bilateral carpal tunnel syndrome, with [Plaintiff] reporting worsening numbness and tingling at the time. However, following that visit, there is no indication of any ongoing symptomatology specifically related to the hands requiring specific treatment. In fact, there is little to no mention of the hands as cause for significant functional limitation or need for more aggressive examination in subsequent clinic notes. [Plaintiff's] testimony at the hearing that it takes days for his hands to recover after he has been typing is not supported in the record.

(R. at 42 (internal citation omitted).)  This discussion was *in addition* to the ALJ's step two analysis, which read as follows:

Carpal tunnel syndrome is a non-severe impairment in this case. There is no evidence in the file showing alleged carpal tunnel syndrome imposes more than a minimal impact on [Plaintiff's] ability to perform basic work activities. At the hearing, [Plaintiff] testified that his hands is his biggest issue. The bulk of the evidence addresses complaints related to the neck and back, with no report of any significant difficulties in the hands. [Plaintiff] has reported discomfort with overhead reaching/raising his arms overhead secondary to cervical spine issues, but no other complaints of manipulative limitation or other restrictions specifically related to the hands/fingers. EMG testing in early 2016 confirmed bilateral carpal tunnel syndrome, with [Plaintiff] reporting worsening numbness and tingling at the time. However, following that visit, there is no indication of any ongoing symptomatology specifically related to the hands requiring specific treatment. In fact, there is little to no mention of the hands as cause for significant functional limitation or need for more aggressive examination in subsequent clinic notes. [Plaintiff's] testimony at the hearing that it takes days for his hands to recover after he has been typing is not supported in the record.

(R. at 35 (internal citation omitted).)  Thus, the ALJ clearly – and repeatedly – recognized Plaintiff's carpal tunnel syndrome, but ultimately found that because "there is no indication of any ongoing symptomatology specifically related to the hands requiring specific treatment" after early 2016, Plaintiff's testimony that his carpal tunnel syndrome was "his biggest issue" was not supported by the record.  (*Id.*)

To further support this conclusion, the ALJ appropriately cited substantial evidence from throughout the record.  For example, the ALJ noted Plaintiff's reports of "independent activities including[] washing up and showering, changing clothes, shopping for personal items, managing

money, caring for pets, managing medications, managing a daily schedule, driving, keeping appointments and completing paperwork independently" as well as Plaintiff's testimony that he likes to cook, tries to take out the trash, and grocery shops alone.  (R. at 37 (citing R. at 833), 43.)  The ALJ also noted that "[t]he balance of physical exams throughout the relevant period are within normal limits," that "there are no indications for any significant . . . motor deficits," and that Plaintiff's motor activity was unremarkable during a June 2019 examination.  (R. at 42 (citing R. at 833).)

Accordingly, given the depth to which the ALJ discussed the relevant evidence regarding Plaintiff's carpal tunnel syndrome, Plaintiff's argument amounts to nothing more than a mere disagreement with the ALJ's factual findings.  Which is to say, Plaintiff argues that the 2016 EMG which revealed carpal tunnel syndrome, combined with Plaintiff's subjective complaints, should have led the ALJ to crafting Plaintiff's RFC with additional manipulative limitations.  But such argument rejects the substantial evidence standard and improperly asks this Court to adopt Plaintiff's interpretation of the record evidence.  The Court cannot do so.  *Douglas v. Comm'r of Soc. Sec.*, 832 F. Supp. 2d 813, 823 (S.D. Ohio 2011) ("Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.") (citing *Rogers*, 486 F.3d at 241); *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *4 (6th Cir. Aug. 10, 2020) ("Even if the record could support an opposite conclusion, we defer to the ALJ's finding because it is supported by substantial evidence, based on the record as a whole.") (internal citations omitted).  Rather, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers*, 582 F.3d at 651 (quoting *Rogers*, 486 F.3d at 241).  Here, as discussed above, the ALJ's decision

regarding Plaintiff's carpal tunnel syndrome is supported by substantial evidence and was made pursuant to proper legal standards, so the Court will not disrupt it.

The Court reaches a similar conclusion regarding the ALJ's consideration of Plaintiff's mental impairments.  Again, for example, the ALJ expressly acknowledged Plaintiff's depression in crafting Plaintiff's RFC, as follows:

> As to [Plaintiff's] mental health complaints, despite his contentions, mental status examinations in the record have generally failed to yield findings to substantiate the conclusion that he has a severe mental impairment—i.e., one that imposes more than a minimal impact on his ability to perform basic work activities. The  record is absent evidence of any ongoing mental health counseling or psychotherapy. [Plaintiff's] primary treatment for alleged depression is medication, from which he generally responds well. He confirmed at the hearing that he does not see a counselor or therapist and has never seen one. He testified that his depression is better with medication. Finding 3 contains an exhaustive discussion of [Plaintiff's] alleged mental impairments and their impact on functioning. As the evidence in this case fails to reflect the presence of a severe mental impairment, no additional restrictions related to his mental health are warranted.

(R. at 43.)  And as the ALJ noted, this discussion was in addition to the ALJ's step two analysis of Plaintiff's depression, which read as follows:

> During the June 2019 consultative psychological evaluation, [Plaintiff] said his depression was improved with the current treatment; his primary treatment was medication prescribed by his primary care provider, which he acknowledged was helpful to him. He described stressors including physical health changes and financial problems but noted his mood was improved; he did not report any crying spells; said he feels okay about himself; reported his energy level had remained unchanged; and did not report any suicidal ideation. He was taking Prozac, and denied prior outpatient psychiatric treatment or hospitalization. According to the exam report, [Plaintiff] presented fully alert and oriented and he exhibited responsive behavior. There were no attention problems observed. Memory was within normal limits. His performance on serial 7's was appropriate, and delayed recall of three items was 2 of 3. His math skills were determined to be in the average range. His general fund of knowledge was average. Overall cognitive functioning was determined to be in the average range. On exam, he reported that he does benefit from treatment. He further reported performance of independent activities including, washing up and showering, changing clothes, shopping for personal items, managing money, caring for pets, managing medications, managing a daily schedule, driving, keeping appointments and completing paperwork independently.

15

> [Plaintiff] added that he has an emotional support system that includes his sons, daughters, brother and friends. In consideration of the objective medical and other evidence of record in its entirety, the undersigned notes that, despite [Plaintiff's] contentions, mental status examinations in the record have generally failed to yield findings to substantiate the conclusion that he has a severe mental impairment—i.e., one that imposes more than a minimal impact on his ability to perform basic work activities. The record is absent evidence of any ongoing mental health counseling or psychotherapy. [Plaintiff's] primary treatment for alleged depression is medication prescribed by his primary care physician, from which he generally responds well. He confirmed at the hearing that he still does not see a counselor or therapist and has never seen one. He testified that his depression is better with medication.

(R. at 36 (internal citations omitted).)  Thus, it is clear to the Court that the ALJ considered, and relied on, an abundance of substantial evidence (both subjective and objective) from throughout the record before concluding that Plaintiff's depression was not a several mental impairment and did not warrant any additional restrictions in the RFC.

Plaintiff insists that the ALJ's RFC is nevertheless inconsistent with the ALJ's findings that Plaintiff had mild limitations in each domain of functionality.  (ECF No. 18 at PAGEID ## 1367-1369.)  This argument is not well taken.  As the Commissioner correctly notes, "the ALJ had no requirement to adopt mental restrictions in the RFC simply because he found 'mild' restriction in the domains of mental functioning at step two."  (ECF No. 23 at PAGEID # 1393.)  Indeed, the Commissioner is correct that courts throughout the Sixth Circuit routinely reject Plaintiff's argument:

> Plaintiff, nevertheless, maintains that the ALJ, by finding she had mental limitations at Step Two, was required to account for these limitations when determining the Residual Functional Capacity (RFC). As this court understands Plaintiff's argument, because the ALJ had already determined Plaintiff had mild limitations in all four broad functional areas at Step Two, the ALJ erred as a matter of law by failing to include specific mental-based limitations in the RFC—even if her limitations were mild and resulted in a finding that her mental impairments were non-severe.
>
> ***

[C]ourts in this circuit have routinely rejected the same argument now advanced by Plaintiff. *See, e.g., Caudill v. Comm'r of Soc. Sec.*, No. 2:16-cv-818, 2017 WL 3587217 at *6 (S.D. Ohio Aug. 21, 2017) (agreeing with the Commissioner and finding that "[c]ontrary to Plaintiff's apparent contention, the ALJ's determination that she had some mild impairment does not require inclusion of mental limitations into the RFC.") (*citing Little v. Comm'r of Soc. Sec.*, No. 2:14-cv-532, 2015 WL 5000253 at *14 (S.D. Ohio Aug. 24, 2015) ("In finding that Plaintiff's social functioning limitation are mild [sic], the ALJ determined that findings of more severe limitations in this domain by others ... were not credible. Thus, the ALJ permissibly declined to include social functioning limitations in the RFC."); *Walker v. Astrue*, No. 3:11-cv-142, 2012 WL 3187862 at *4-5 (S.D. Ohio Aug. 3, 2012) (finding that substantial evidence supported the ALJ's determination that the claimant's mental impairments were mild enough not to warrant specific RFC limitations)); *accord McDowell v. Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-00297-SL, 2021 WL 1911459, at *9 (N.D. Ohio Apr. 19, 2021) (Henderson, M.J.), *report and recommendation adopted*, 2021 WL 1909789 (N.D. Ohio May 12, 2021) ("That the ALJ found Claimant had mild limitations in regards to the functional areas does not mandate inclusion of limitations in the RFC."); *Taylor v. Berryhill*, No. 17-11444, 2018 WL 3887521 at * (E.D. Mich. July 5, 2018) ("Indeed, courts in this district have found that mild limitations [in the paragraph B criteria] do not require incorporation into an RFC assessment.") (internal quotations omitted). In fact, the Sixth Circuit has held that sometimes even those impairments that are deemed "severe" at Step Two do not always have to be included in the RFC. *See Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. App'x 425, 429 (6th Cir. 2007) (rejecting "the proposition that all impairments deemed 'severe' in step two must be included in the hypothetical.").

*Avers v. Kijakazi*, No. 3:20-CV-01433, 2021 WL 4291228, at *10-11 (N.D. Ohio Sept. 21, 2021) (internal footnote omitted).  And "[a]lthough it is possible that an ALJ's failure to explain how a claimant's mild psychological limitations affect the RFC assessment *may* constitute reversible error where the ALJ's RFC analysis is completely devoid of any discussion concerning a claimant's mental impairments," the ALJ here adequately discussed Plaintiff's depression, as demonstrated above. *Id.*[4]  In addition to the substantive evidence cited above, however, the ALJ also reasonably relied on the opinions of the State agency consultants who did not find Plaintiff's

---

[4] Plaintiff appears to recognize this, as Plaintiff does not rebut the Commissioner's argument on this issue in Plaintiff's Reply brief.  (*See* ECF No. 24.)  Regardless, for the sake of completeness, the Court finds it necessary to endorse *Avers*.

depression to be severe.  (R. at 44 ("These examiners also found [Plaintiff] does not have a severe mental impairment, with indications for no more than 'mild' limitations related to the 'B' criteria of the mental health impairments. They also found [Plaintiff] limited to less than the full range of light exertion.") (citing R. at 125-139, 141-159).)

Accordingly, the Court cannot conclude that the ALJ insufficiently discussed or analyzed Plaintiff's depression in concluding that no further mental-based limitations were warranted for Plaintiff's RFC.  Plaintiff's assignment of error is not well taken.

## VI.    CONCLUSION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits, and it was made pursuant to proper legal standards. Based on the foregoing, Plaintiff's Statement of Errors (ECF No. 18) is **OVERRULED** and the Commissioner's decision is **AFFIRMED**.  The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**


**Date:    July 14, 2022**                          _/s/ Elizabeth A. Preston Deavers_
                                                   **ELIZABETH A. PRESTON DEAVERS**
                                                   **UNITED STATES MAGISTRATE JUDGE**